IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIC HALL,
    Plaintiff,
    v.
TIMOTHY S. NEW,
    Defendant

Case No. 3:13-cv-131-KRG-KAP

Report and Recommendation

Recommendation

Plaintiff Eric Hall, an inmate in the Pennsylvania prison system from 2003 to 2014, filed three civil rights complaints alleging various employees of the Pennsylvania Department of Corrections retaliated against him for filing grievances when he was confined at S.C.I. Somerset, Case No. 3:13-cv-131-KRG-KAP, Case No. 3:13-cv-141-KRG-KAP, and Case No. 3:14-cv-19-KRG-KAP. Timothy New, the remaining defendant in this matter, has filed a motion for summary judgment, docket no. 21, and I recommend that it be granted. See also 28 U.S.C.§ 1915A (imposing an independent duty on the court to weed out frivolous and meritless inmate complaints about prison conditions).

Report

The standard for grant of summary judgment is known to the court and need not be repeated; the account of the facts given here comes from Hall's deposition (Exhibit 3 to defendant's appendix to his motion at docket no. 24-1) and the documents in the record that both sides have submitted. Hall was, in September 2012, placed in the RHU at Somerset; at first this was pending investigation of disciplinary charges against him, then it was as

a result of a disciplinary sentence. In October 2012, defendant New began running the daylight shift (6 a.m.-2 p.m.) in the RHU. Two months later, in December 2012, New moved Hall to two allegedly unsuitable cells, one a very cold one that Hall asserts caused one asthma attack, and the other of which exposed Hall to more unpleasant sounds, sights, smells, and more of what Hall refers to as "drama" of other RHU inmates than Hall had experienced in his previous cell. Hall claimed that New thus violated the Eighth Amendment by subjecting him to inhumane conditions and violated the First Amendment and Fourteenth Amendment because New's motive for the moves was to retaliate against Hall for filing grievances.

From Hall's deposition, there are two separate episodes that must be considered. From September to December, Hall was in cell HD-1011, which as the numbering indicates means cell 1011 in D pod of H building. While in HD-1011, Hall filed grievances about the cold condition of his cell. Hall filed many other grievances, enough of which were found to be frivolous that he was placed on grievance restriction status, limiting the number of grievances that would be considered from him. One of the nonfrivolous grievances Hall filed was about the danger to him from having the "wicket" in his cell door left open. Hall depo. at 18-20. A wicket is the aperture through which RHU inmates would be cuffed before moves and through which food and other items would be passed. Some inmates were known to commit misconducts by "holding

their wickets hostage" (I presume that means by refusing to remove their hands so that the aperture could be closed), while other inmates were known to throw things into or out of cells through open wickets. Hall's grievance apparently resulted in a review of procedures in managing wickets by the RHU staff. Id.

There is a custom or policy of moving RHU inmates approximately every 90 days. At the time of Hall's 90-day move on December 16, New transferred Hall from HD-1011 to HA-1007, that is, to a cell in A pod. It was a corner cell, one equipped with a more tamper-resistant "command feeder" wicket, and New told Hall about that at the time. Hall depo. at 23. Hall objected to New that HA-1007 was too cold and told New that there was a doctor's order that prohibited him from being placed in a corner cell. Hall depo. at 33. New told Hall that he would check on the existence of such an order but placed him in the cell; New also got Hall cleaning supplies and a blanket, though not an extra blanket. Hall depo. at 25-26, 29-30. Two days later on December 18, Hall had an asthma attack that was immediately treated by a nurse with a follow-up by a physician assistant. Hall depo. at 34-35.

Defendant's Exhibit 8 is a doctor's order dated September 21, 2006, that states "Please Do Not place patient in Corner cell in RHU due to asthma indefinitely (Lt. Shote)." Apparently during an earlier placement in the RHU in 2006, a time during which Hall

was an inmate at S.C.I. Frackville, a doctor had indeed issued an order as Hall described.

On December 24, four days after Hall's placement in HA-1007, a corrections officer (not New, who apparently was on vacation) moved Hall to HB-2024 because there was an inmate who had taken his wicket hostage and was to be transferred to a command feed cell. Hall depo. at 44. Hall liked HB-2024 because he was warmer on the top tier and the "fishing" was better than in HA-1007, a lower tier corner cell. Hall depo. at 45-46. Fishing is the practice by inmates in the RHUs of passing food, legal materials, (and in at least one case known to me, weapons), by means of tossing or sliding a weight tied to a string from the space under the inmate's cell door to another cell. Some inmates are quite adept at fishing.

Four or five days later, Hall was moved again, back to A pod, first to HA-1002 and later to HA-1005; he remained on A pod until his transfer to another prison in May 2013. Hall continued to file grievances throughout this period. Hall alleged that during this stay in A pod he was subjected to excessive noise and "drama" by the inmates. One of the ways inmates in the RHU could express aggression toward other inmates was by making excessive noise, and Hall recounts that one time he had to admonish his cellmate not to bang on the door in a sonic battle he was having with another inmate. Hall depo. at 52-53. Another time an inmate

smeared feces on his (own, not Hall's) cell wall. Hall depo. at 51-52. Hall's own cellmates were never a problem. Id. Hall alleges that exposure to other cell's inmates nevertheless caused him to develop what he claims in his deposition to be post-traumatic stress disorder. Hall depo. at 42-43.

As can be seen, the only physical consequence Hall alleges from conditions in HA-1007 is the one asthma attack on December 18, 2012. Hall alleges this was triggered by the cold. Hall admittedly sometimes went out into the yard in winter and reported no asthma attacks from that, Hall depo. at 38-41, although it goes without saying that temperatures in the winter would be lower outside than inside. Hall describes other asthma attacks as triggered by his exercising, his stress level, or his exposure to excess heat. Hall depo. at 39-40. Accepting for the moment Hall's ability to provide an expert opinion about the cause of his asthma attack, this singular episode was one for which Hall indisputably received prompt medical attention, and for which Hall does not allege any further consequences.

The Supreme Court's application from the 1970s onward of the Eighth Amendment's prohibition of cruel and unusual punishment to complaints about prison conditions not intended as punishments at all was a response to some very real abuses of prisoners, see e.g. Hutto v. Finney, 437 U.S. 678 (1978). Early in the course of prison conditions jurisprudence, however, the Court was constrained

to state the obvious truths that discomfort was not a constitutional violation, and that only those conditions that result in deprivations of basic human necessities violate the Eighth Amendment. See Wilson v. Seiter, 501 U.S. 294 (1991); Rhodes v. Chapman, 452 U.S. 337 (1981). See also Estelle v. Gamble, 429 U.S. 97, 106 (1976)("serious" medical needs). Plaintiff's allegations of severe cold and excessive noise, even taken at face value, can by no stretch of the imagination be considered deprivations of basic human needs. And even taken at face value, Hall's description of his immediately responded-to asthma attack does not amount to a serious medical need.

In addition to the objective component of an Eighth Amendment violation, there is a subjective component in cases such as this one, where the inmate seeks money damages from corrections personnel for subjecting him to inhumane conditions. The Supreme Court has held that personal liability requires proof of the defendant's deliberate indifference:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994). Hall testified that he told New that the cell was cold (a complaint he had made about his previous cell as well) and that there was a doctor's order

6

forbidding his placement in a corner cell (there was as noted above an order from 2006), and that New said he would check on the existence of such an order.

It is certain that Hall's medical history followed him to Somerset. It is possible, given the standardized construction of Pennsylvania's newer prisons, that the concerns that motivated the physician's order at Frackville in 2006 would be relevant to cell placement at Somerset. But it is not claimed, much less shown to be a matter genuinely in dispute, that this order was in fact in effect on December 16, 2012, much less that New was conscious of this order. Hall does not even claim that he mentioned the order to the medical personnel who responded promptly and effectively to his asthma attack on December 18. There is no evidence whatsoever that New was aware of this order on December 16 and ignored it.

New alleges he did not even know about Hall's asthma on December 16, docket no. 24-1 Exhibit 2. There is no evidence that New ever checked into Hall's assertion about a doctor's order either before or after Hall's asthma attack. But it does not matter, legally, whether New diligently followed up on Hall's assertion about a doctor's order and (since normally corrections staff have no access to inmate medical records for privacy reasons) had not yet heard back from medical, or whether New forgot the matter immediately after the move and never gave the matter any

further thought, or whether New concluded that Hall was crying wolf and did nothing further: any of those states of mind is not equivalent to deliberate indifference. For a corrections officer to disregard an inmate's complaints or assertions where the corrections officer does not have independent confirmation of them does not even rise to negligence in many cases, because when an inmate makes an uncorroborated self-serving assertion it is often reasonable for the corrections officer to suspect that the inmate is not telling the truth. In extreme cases (such as a claim of a fire in an adjoining cell) it would be unreasonable and perhaps even deliberately indifferent for a corrections officer to choose not to investigate an inmate's complaint, where the dangers from a lack of investigation were themselves so patent that knowledge can be presumed. Compare Gates v. Cook, 376 F.3d 323, 334 (5th Cir.2004)(health dangers from mosquito-borne West Nile virus and from human waste sufficiently known that showing of inadequately screened windows and defective toilet system constituted Eighth Amendment violation); Haley v. Gross, 86 F.3d 630, 642 (7th Cir.1996)(risk of injury to plaintiff from his cellmate in a cell known to be deadlocked (off the general locking system) as a result of the cellmate's actions and who was acting "like he was crazy" and openly threatening to set cell on fire was sufficiently known to corrections officer to support deliberate indifference claim).

But the mental state Hall must prove is deliberate indifference on the part of New to Hall's specific complaint that the cell was too cold and to that there was a doctor's order (assuming it to be applicable) that Hall could not be moved to a corner cell. By definition a corrections officer who disregards an inmate's complaints as untrustworthy cannot be deliberately indifferent because a person cannot "know" what he disbelieves. In the absence of evidence of knowledge of the doctor's order (assuming for the present that New would be bound to believe that order was still in effect, six years and three prison transfers later) New may have just as well believed that Hall's claim was motivated by his desire not to occupy a corner cell unsuited to fishing. Hall depo. at 54. To allow Hall's claim to go to a jury trial would be tantamount to allowing a finding of liability by speculation.

As for the period from December 25, 2012 through May 2013 when Hall was back in A pod, there is a factual conflict which at this stage must be resolved in favor of Hall: Hall says he wanted to stay in B pod, while New says that Hall was moved back to A pod at Hall's request. Accepting this, Hall also asserts that the noise level from his fellow inmates while he was confined in A pod caused him what he claimed in his deposition to be post-traumatic stress disorder. An inmate's subjective impression of excessive noise is not evidence of a violation of the Eighth Amendment. Nor

is Hall's self-diagnosis of PTSD evidence of an injury. The Prison Litigation Reform Act, as codified at 42 U.S.C.§ 1997e(e), prevents an inmate from alleging an Eighth Amendment claim without a prior showing of a physical injury. Hall provides no evidence that he ever suffered a physical injury. Summary judgment should be entered for New on the Eighth Amendment claim. If there were even a close call here, it would be necessary to point out that qualified immunity (a defense I am required to consider "at any time" by 28 U.S.C.§ 1915A) would mandate summary judgment for New, since there is no precedent, much less clearly established precedent, for the proposition that an inmate's complaint of excessive noise establishes a violation of the Eighth Amendment.

Of course Hall pins most of his hopes on the retaliation claim. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.2003)(listing the elements); Rauser v. Horn, 241 F.3d 330, 334 (3d Cir.2001)(same). Retaliation, thanks to the lack of attention given to it in precedential opinions since Mitchell, has become the tail that wags the dog in prison conditions cases, because the burden of production is lower. It is not necessary that Hall prove an Eighth Amendment violation to establish a retaliation claim because the "adverse action" that is the second element of the cause of action can consist of action that would deter a reasonable inmate, and that need not rise to the level of subjecting the inmate to objectively intolerable conditions. Nevertheless, that

element of the retaliation cause of action is more than a pleading requirement: an inmate cannot claim that every action, no matter how trivial, was adverse action. Simply moving an inmate from one cell to another within the same custody level is part of everyday prison management, as even Hall recognizes, and is never adverse action sufficient to deter a person of ordinary firmness from filing grievances. "Person of ordinary firmness" denotes an objective standard. Hall asserts that any cell he was moved to in A pod other than the cell he preferred in B pod was so upsetting to him that it constituted adverse action. That Hall subjectively preferred not to move does not make New's actions adverse action (and if subjective impact were relevant of course Hall was not in fact deterred from filing grievances).

Additionally, for the third element of the retaliation cause of action Hall simply speculates that there was some causal connection between his filing grievances and New moving him. The most that Hall offers, Hall depo. at 12-13, is that on one occasion that Hall could not specifically date, New spoke to him after investigating a grievance and said to Hall "Are you okay now?" and when Hall replied "Yep, I'm okay at this time, but you know there's a lot of other stuff that you guys are doing that you aren't supposed to do," New responded "Well, if you're okay now stop filing the grievances." Hall concludes that this was "giving me a warning," and candidly admits that this is an "assumption" on his

11

part. Hall depo. at 13. As I have said before in other cases, inmate grievance are an omnipresent fact of prison life, and if a retaliatory animus can be legally derived from an inmate's subjective interpretation of his objectively routine interaction with a corrections officer, then frivolous inmate litigation becomes the legal equivalent of a breeder reactor. Every rational inmate's first order of business upon arrival in prison would be to file grievances, whether meritorious or frivolous: every unfavorable action thereafter, under plaintiff's view of law, would be *prima facie* retaliatory. That would be an absurd rule of law in non-inmate cases, and in inmate cases a perverse incentive to the subset of litigants Congress has already found are so unusually likely to file frivolous lawsuits that Congress has in 28 U.S.C.§ 1915A assigned the judiciary an independent duty to screen their complaints for merit.

New asserts that for the initial move to HA-1007 at least one motivation for that particular cell was that it had a more secure wicket than the cells Hall had complained about being a danger to him from open wickets. docket no. 24-1 Exhibit 2. A jury could reject New's explanation, but if even it did there is still nothing to support the characterization of any move from cell to cell as retaliatory. As Hall himself states, during the end of 2012 the RHU held about 126 inmates in a space with a capacity of 130, docket no. 30-7, Exhibit T to Hall's opposition to the motion

for summary judgment: this move was therefore to one of the very few cells open in the RHU to which Hall could be moved during what Hall acknowledges as a routine proceeding, a 90-day move.

New also asserts that employees at Somerset checked the temperature of Hall's cell and found it adequate, and that from the design of the cell block the conditions Hall described in HA-1007 could not have occurred without at a minimum being noticeable throughout the entire cell block. docket no. 24-2, Exhibit 4 (the relevant grievance and responses) and Exhibit 11 (Declaration of David Buck). Hall's response is to say the defendant and Pennsylvania Department of Corrections employees lie. Assuming again that a jury disbelieved the defendants, there would be nothing to support the characterization of any move to cell HA-1007 as retaliatory, since there is no objective evidence to support Hall's position: his implicit argument that evidence of knowledge of his subjective discomfort is the equivalent of evidence of objectively harsh conditions **known to and believed by defendant New** is simply not a correct proposition of law.

Because there is no evidence sufficient to allow any reasonable jury to find either the second or the third element of a *prima facie* case of retaliation, summary judgment should be entered for defendant New. In retaliation cases mere "first I filed the grievance and then actions I didn't like which equal adverse action took place" minimalism is often enough to get past

13

the motion to dismiss stage, but where the record shows that there is simply nothing on which a legitimate verdict could be entered for plaintiff, summary judgment should be entered for defendant.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to serve and file written objections to this Report and Recommendation.

Additionally, plaintiff having been released from custody, he must within the time for filing objections pay the filing fee or provide an up to date motion adequately stating why he should continue in forma pauperis.

DATE: 7 January 2015

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF and by U.S. Mail to:

Eric Hall
1826 Widener Place
Philadelphia, PA 19141